<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SUSAN GLASBRENNER and<br>DAVID GLASBRENNER, | : | Hon. Joseph H. Rodriguez |
| Plaintiffs, | : | Civil Action No. 03-3353 |
| v. | : | **MEMORANDUM OPINION<br>AND ORDER** |
| GULF INSURANCE CO., et al, | : | |
| Defendants. | : | |

**RODRIGUEZ**, Senior District Judge

This matter comes before the court on Defendant Gulf Insurance Company's ("Gulf") motion seeking a determination of choice of law [65] in this insurance coverage dispute. Gulf contends that New York or Connecticut has the most significant interest in the underlying insurance transaction and that under either of these states' laws, notice of a claim that was given over nine years after the underlying incident and seven years after the underlying lawsuit is unreasonably late and in breach of the conditions of the Gulf Excess Policy. Defendant asks that the complaint be dismissed accordingly. Plaintiffs David and Susan Glasbrenner (the "Glasbrenners") contend that New Jersey law governs interpretation of the Gulf Excess Policy and that, under New Jersey law, Gulf has not demonstrated requisite prejudice for dismissal of their claim. The Court has considered the written submissions of the parties. For the reasons discussed below, Defendant's motion will be denied.

## **Factual Background**

On April 17, 1994, Plaintiff Susan Glasbrenner was injured when a box of blinds

fell on her in a Caldor retail store located in Somerdale, New Jersey. On February 1, 1995, Susan and her husband Plaintiff David Glasbrenner, both New Jersey residents at the time, brought a bodily injury lawsuit against Caldor, Inc. in New Jersey Superior Court, Camden County. Seven months later, Caldor, Inc. filed Chapter 11 bankruptcy relief in the United States Bankruptcy Court for the Southern District of New York. Consequently, the Glasbrenner's state court personal injury suit was stayed. In early 2001, the bankruptcy court granted the Glasbrenners limited relief from the automatic stay and permitted them to proceed with their state action. In April 2003, the case went to trial, and the Glasbrenners were awarded $1.7 million plus pre-judgment interest (totaling $2,647,827.91).

      Gulf was Caldor's pre-petition excess insurer from August 3, 1993 through August 4, 1994. The insurance policy ("Gulf Policy" or "Policy") was a commercial umbrella policy which provided excess coverage above an Employer's Liability Policy, General Liability Policy and Business Automobile Policy under which Caldor was covered by a different insurer. The Policy applied to covered events that happened or were committed anywhere. As of January 23, 1993, there were a total of 136 Caldor stores in nine states, including 39 stores in New York, 30 stores in Connecticut, and 23 stores in New Jersey. One of two Caldor distribution centers was located in New Jersey; the other was located in New York.

      At the time the Gulf Policy was negotiated and issued in 1993, Gulf maintained its principal place of business in New York. Caldor was a New York corporation with its principal place of business in Connecticut. The Policy was negotiated on behalf of Caldor by a Connecticut broker; the broker listed Caldor stores located in Connecticut, New

2

York, Massachusetts, Rhode Island, Maryland, New Jersey and New Hampshire in its request for a price quote for Caldor. Premiums were paid to Gulf at its New York office.

The Gulf Policy was in effect at the time of Susan Glasbrenner's injury and provided coverage in excess of Caldor's primary commercial general liability policy issued by another company. Gulf has alleged that the notice provision of the Gulf Policy was breached because Gulf did not receive notification of the Glasbrenner's 1994 incident and subsequent legal action until 2002. As such, Gulf has denied coverage to the Glasbrenners.

## **Procedural History**

The procedural background of this case is extensive and warrants review.  On May 21, 2003 Gulf initiated litigation against Caldor and the Glasbrenners in the Southern District of New York. Both the New York action filed by Gulf and the present matter, initiated by the Glasbrenners on June 11, 2003 in the Camden County Superior Court, present the same issue for disposition: whether Defendant Gulf is required to pay a judgment the Glasbrenners obtained against Gulf's insured.

The present action was removed to this Court and asserts claims for garnishment, declaratory judgment, breach of contract, and breach of good faith and fair dealing for Gulf's failure to pay the Glasbrenners their judgment under the Gulf/Caldor umbrella insurance policy.  Because Gulf filed suit first in New York, this Court entered a stay on November 12, 2003 predicated on the "first-filed" doctrine, holding that "any decision the New York District Court makes concerning jurisdictional issues directly affects the viability of the New Jersey action."

While the present matter was held in abeyance, over the course of nearly five

years, the district court for the Southern District of New York made a series of rulings that were appealed to the Second Circuit.  Ultimately, the district court in New York dismissed Gulf's Amended Complaint for lack of personal jurisdiction and the Second Circuit affirmed.

Given that the New York matter was dismissed, this Court granted Plaintiffs' motion to reopen the New Jersey case on October 18, 2010.  Now, Gulf seeks a declaration that laws of New York or Connecticut govern interpretation of the notice provision of the insurance contract at issue and, consequently, mandate that Plaintiffs' complaint be dismissed as untimely.

## Discussion

### I. Standard of Review

This Court exercises diversity jurisdiction over the present matter pursuant to 28 U.S.C. § 1332.  A federal court sitting in diversity must apply the choice-of-law rules of the forum state; here New Jersey.  Hammersmith v. TIG Ins. Co., 440 F.3d 220, 226 (3d. Cir. 2007) (citing Klaxon v. Stentor Mfg. Co., 313 U.S. 487 (1941)).

New Jersey's choice-of-law analysis calls for a determination of which state has the "greatest interest in governing the particular issue." Veazey v. Doremus, 103 N.J. 244, 247 (1986).  The "governmental interest analysis" or "most significant relationship test" proceeds in two steps. Lebegern v. Forman, 471 F.3d 424, 428 (3d Cir. 2006); State Farm mut. Auto. Ins. Co. v. Estate of Simmons, 84 N.J. 28, 36-37 (1980).  First, the Court must identify whether an actual conflict exists between the laws of New York, Connecticut and New Jersey.  Lebegern, 471 F.3d at 428.  Here, the parties agreed that there is a conflict between the law of these states on the late-notice issue.

4

The second step of the process requires evaluation of each state's interest "in applying its own law[.]" Id. (citing Fu v. Fu, 733 A.2d 1133, 1138 (N.J. 1999)). This requires consideration of "the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and the parties." Veazey, 510 A.2d at 1189 (citing Henry v. Richardson-Merrell, Inc., 508 F.2d 28, 32 (3d Cir. 1975)).

In the context of liability insurance contracts, New Jersey courts reject the "mechanical and inflexible *lex loci contractus* rule in resolving conflict-of-law issues" and consider factors relating to and enumerated in §§ 6, 188 and 193 of the Restatement (Second) of Conflicts of Law ("Restatement"). Gilbert Spruance Co. v. Pa. Mfrs. Ass'n Ins. Co., 629 A.2d 885, 888-89 (N.J. 1993); State Farm mut. Auto. Ins. Co. v. Estate of Simmons, 417 A.2d 488, 492-93 (N.J. 1980). Section 6 of the Restatement identifies the following determinative factors:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement § 6. When applying these factors, § 188 identifies five contacts which are to be considered according their relative importance: "(a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." Restatement § 188.

While § 188 provides the general rule governing choice of law in contract actions,

the New Jersey Supreme Court set forth a specific choice-of-law framework for interpreting casualty-insurance contracts such as those here at issue in Gilbert Spruance. The framework provides that "a court looks first to Restatement section 193, which provides that the place that 'the parties understood … to be the principal location of the insured risk governs unless some other state has a more significant relationship under the principles stated in [section] 6 to the transaction and the parties.'" Pfizer, Inc. v. Employers Ins. of Wausau, 712 A.2d 634, 637-38 (N.J. 1998) (citing Gilbert Spruance, 629 A.2d at 893).[1]

The choice of law issue can be straightforward when the policy covers risks located primarily in a single state. Pfizer, 712 A. 2d at 638. But "in certain cases when the subject matter of the insurance is an operation or activity and when that operation or activity is predictably multistate, the significance of the principal location of the insured risk diminishes." Gilbert Spruance, 629 A.2d at 893 (citation omitted) (Accord Restatement § 193, cmt b). In such situations, the governing law is that of the state with the dominant significant relationship according to the principles set forth in § 6. Id.; Pfizer, 712 A.2d at 639 (where the insured risks are 'to some degree transient' Spruance

---

[1] Section 193 provides in full:

The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

Restatement § 193.

6

requires a § 6 analysis in order to choose the applicable law (citing Gilbert Spruance, 629 A.2d at 894)). "The site-specific approach of section 193 inevitably means that more than one state's law may govern coverage questions arising under a casualty insurance policy." Pfizer, 712 A.2d at 638.

With these principles in mind, the Court turns to the choice of law issue presented in this case.

## II. Analysis

The parties have stipulated to the majority of facts in this case related to the negotiation and formation of the insurance contract between Gulf and Caldor, as well as the conflict between the laws of New Jersey on the one hand and New York and Connecticut on the other with respect to the issue of late notice.[2] The parties only dispute with respect to this motion is which state's law applies.

Gulf argues that New York, or alternatively Connecticut, has the dominant significant relationship to the insurance transaction because the contract was negotiated between New York and Connecticut and New York was the place of contracting. According to Gulf, the place of contracting "presumptively" has the most significant relationship to the parties and the transaction and is therefore the principal location of the insured risk. Gulf asserts that the interests of both New York and Connecticut outweigh the interest of New Jersey and accordingly, that either state's law should apply rather than New Jersey's. The Glasbrenners, however, argue that the principal location of the insured risk was New Jersey, which was the location of the covered Caldor store

---

[2] The law of Connecticut is no longer in conflict with that of New Jersey as to this issue. See Part A, infra.

where Susan Glasbrenner was injured. According to Plaintiffs, Gulf and Caldor knew that the store was located in New Jersey and calculated the risks and premiums accordingly.[3] Because the principal location of the insured risk was in New Jersey, Plaintiffs argue that § 193 and New Jersey case law indicate that New Jersey law should apply.

**A. Actual Conflict**

The first step in the conflict of law analysis is to determine whether an actual conflict exists. Here, a conflict exists as between New York and New Jersey with respect to the late-notice issue. Under New York law, a failure to satisfy the notice requirement may be a defense against a claim for coverage without a showing of prejudice on behalf of the insurer. Pfizer, 712 A.2d at 644 (citing Unigard Sec. Ins. Co. v. North River Ins. Co., 594 N.E.2d 571, 573 (N.Y. 1992)). New Jersey courts, however, require the insurer to demonstrate prejudice before coverage may be avoided. Pfizer, 712 A.2d at 644; Grazis v. Miller, 892 A.2d 1277, 1282 (N.J. 2006). Connecticut previously placed the burden on the insured to show that the insurer was not prejudiced by the insured's failure to comply with the notice provision. Aetna Casualty & Surety Co. v. Murphy, 538 A.2d 219 (Conn. 1988). The Connecticut Supreme Court recently changed the law with respect to this issue, and has held that "the insurer bears the burden of proving, by a preponderance of evidence, that it has been prejudiced by the insured's failure to comply with a notice provision." Arrowood Indem. Co. v. King, - - - A.3d - - - -, 2012 WL 896379, *8 (Conn. March 27, 2012) (overruling Aetna, 538 A.2d 219). Thus, there is no

---

[3] Gulf does not dispute that the New Jersey stores may have been considered in the calculation of the premium for the Policy. Def.'s Reply Br. 5, n. 2.

longer a conflict between New Jersey and Connecticut law. As between Connecticut and New Jersey, therefore, the Court would apply New Jersey law. The Court will proceed with the conflict of law analysis as between New York and New Jersey.

**B. Conflict of Law Analysis**

As guided by the New Jersey Supreme Court, the Court first looks to Restatement § 193 to determine which state's law applies to this insurance dispute. Initially, therefore, the Court seeks to determine which state the parties understood to be the principal location of the insured risk under the policy. The Restatement defines the principal location of the insured risk as "the state where it will be during at least the major portion of the insurance period." Restatement § 193, cmt b. This principal location may be predicted fairly accurately "when the insurance covers an immovable object, such as a house," or, in the case of an automobile policy, where the parties know where the vehicle will be garaged during most of the period of coverage. Id. "The location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally, in a single state." Id. Where the risk cannot be principally located in a single state, however, Comment b states that the location of the risk has less significance; this may be the case "where the insured object will be more or less constantly on the move from state to state during the term of the policy" and "where the policy covers a group of risks that are scattered throughout two or more states." Id.; See Gilbert Spruance, 629 A.2d at 893.

Here, the umbrella policy at issue insured against multiple risks in several states, including states other than New York, New Jersey and Connecticut. The Court therefore

9

looks to § 193's Comment f, which addresses the "special problem . . . presented by multiple risk policies which insure against risks located in several states." Restatement § 193, cmt f. It provides:

> A special problem is presented by multiple risk policies which insure against risks located in several states. A single policy may, for example, insure dwelling houses located in states X, Y and Z. These states may require that any fire insurance policy on buildings situated within their territory shall be in a special statutory form. If so, the single policy will usually incorporate the special statutory forms of the several states involved. Presumably, the courts would be inclined to treat such a case, at least with respect to most issues, as if it involved three policies, each insuring an individual risk. So, if the house located in state X were damaged by fire, it is thought that the court would determine the rights and obligations of the parties under the policy, at least with respect to most issues, in accordance with the local law of X. In any event, that part of a policy which incorporates the special statutory form of a state would be construed in accordance with the rules of construction of that state.

Id. Under this formulation, the Gulf Policy would be viewed as if it involved multiple policies insuring individual risks and the Court would determine the rights and obligations of the parties, with respect to most issues, under the law of the state in which the covered liability arose, here, New Jersey.[4] See NL Industries, Inc. v. Commercial Union Ins. Companies, 926 F. Supp. 1213, 1223-24 (D.N.J. 1996); Pittston Co. v. Allianz Ins. Co., 795 F. Supp. 678, 685-86 (D.N.J. 1992). But see, Continental Ins. Co. v.

---

[4] This is not to say that the location in which harms occur or liability arises is inevitably the principle location of the insured risk or that the state in which a harm or liability arises will always see its law applied in cases involving conflicts of insurance law. See e.g., Pegg v. United Services Auto. Ass'n, Civ. No. 09-2108, 2010 WL 5317371, *6 (D.N.J. Dec. 17, 2010) (fact that injury from automobile accident occurred in Pennsylvania had no bearing on "insured risk" contact because New Jersey, where vehicle was garaged, was the principal location of the insured risk). Rather, taken as a policy insuring individual New Jersey risks, the principal location of the insured risk is New Jersey; it is for this reason, not simply because a harm occurred in the state, that New Jersey law would govern.

Beecham, Inc., 836 F. Supp. 1027, 1036 (D.N.J. 1993) (stating that Comment f "applies only to policies covering risks for which a state requires a particular statutory form, typically fire insurance policies, which form will generally be incorporated into the policy").

To apply the law of a state that may be otherwise unconnected to an insurance contract for the simple fact that the multi-risk policy complies with the formal requirements of that state is an acknowledgment of the state's considerable interest in having its law apply to policies which insure property and risks within its borders. It concedes that a state that is otherwise unconnected to the contract may require that a multi-risk policy follow its formal requirements if insurance is to be effective within the state. Surely the same can be said of the state's substantive law. Limiting the application of Comment f only to situations precisely identical to its example seems to imply that, at least in multi-state risk situations, such an interest arises only from, or is created only by, the form of the document. This cannot be the case, else § 193's general emphasis on the importance of the principal location of the insured risk would have little meaning.

The Restatement explains this importance and its relationship to the state's interest:

> A number of reasons serve to explain why such importance is attached to the principal location of the insured risk. This location has an intimate bearing upon the risk's nature and extent and is a factor upon which the terms and conditions of the policy will frequently depend. So the cost of automobile liability or of collision insurance will probably be higher if the place where the automobile will be principally garaged during the term of the policy is an urban, as opposed to a rural, community. Similarly, the cost of fire insurance will depend in part upon the place where the insured thing is located. For these and other reasons, the location of the risk is a matter of intense concern to the parties to the insurance contract. *And it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect*

11

> *that the local law of the state where the risk is to be principally located would be applied to determine many of the issues arising under the contract.* Likewise, the state where the insured risk will be principally located during the term of the policy has a *natural interest* in the determination of issues arising under the insurance contract.

Restatement § 193, cmt c (emphasis added). Such factors do not arise merely because a portion of a policy comports with statutory form requirements of a given state. Rather, they are tied to that state's "natural interest" in policies insuring risks within the state, which is reflected in Comment f for reasons surpassing mere form. The Court does not read Comment f as placing form over substance, allowing for the application of a state's substantive requirements only in cases where formal ones are present.[5]

The Court, therefore, construes the policy--which insured against liabilities arising in New Jersey, anticipated that New Jersey law would set the nature and boundaries of those liabilities, and accounted for New Jersey-based risks in its

---

[5] See NL Industries, 926 F. Supp. at 1224 (comment b's "less significant language . . . primarily seeks to distinguish between moveable risks (i.e., chattels) and immoveable ones. It would be relevant, for instance, where wastes were generated in some states and routinely disposed of in other states"). This reading of § 193 aligns with Gilbert Spruance, which applied § 6 rather than § 193 "because the risk at issue [there] was to some degree transient." Gilbert Spruance, 629 A.2d at 894. The Court observed that in hazardous-waste cases, two potential principal locations of risk exist: the state of generation, or the state of disposal. Id. Choosing either the state of generation or the state of disposal would be arbitrary. Id. Unlike the risks in Gilbert Spruance or the other toxic waste cases, however, the risks here were not transient, but at fixed locations within these states. The insured risks with respect to fixed retail locations is more akin to the fixed dwelling houses of Comments b and f than the insured risk of toxic waste generated in one state and transported into others. The location of the insured risks with respect to each house in Comment f's example is as clear as it is for the house in Comment b whether or not a state requires a statutory form which is included in the policy. It cannot be said that it is only where State X requires a form and the policy provides for it that the parties understood the risk with respect to the State X house to be in State X, but where State X does not require such a form the parties did not possess the same understanding.

calculations of premiums—as an individual policy insuring risks located in New Jersey as to Caldor's New Jersey locations. This approach comports not only with the Restatement, but with the approach of New Jersey courts, which have held that "a casualty insurance policy, wherever written, which is purchased to cover a New Jersey risk, *alone or along with risks in other states*, is subject to interpretation of its coverage and exclusion language according to New Jersey local law." Johnson Matthey Inc. v. Pennsylvania Mfrs.' Ass'n Ins. Co., 593 A.2d 367, 373 (N.J. Super. App. Div. 1991) (emphasis added). See also, Pfizer, 712 A.2d at 643 (law of New York, where insurance policies were purchased, paid for and maintained, controlled late-notice issue *unless* the law of the site state differed because the site state had the dominant significant relationship); NL Industries, Inc. v. Commercial Union Ins. Co., 154 F.3d 155, 158-60 (3d Cir. 1998) (same); NL Industries, 926 F. Supp. 1213, 1223-24 (D.N.J. 1996) (applying site-specific approach under § 193 cmt f); Pittston, 795 F. Supp. at 685 ("For policies that cover risks located in multiple states . . . the 'place of contract' rule does not comport with the parties' expectations of the location of the insured risks"). As the New Jersey Supreme Court found in Pfizer, the policy here "contain[s] sweeping declarations of coverage that should be given effect where the risks arise." 712 A.2d at 642. This is so because "a policyholder would expect that it would be indemnified under the law in effect at the place where liability is imposed." Id. Here, that place is New Jersey.[6]

---

[6] The New Jersey Supreme Court also applied New Jersey law, rather than New York law, to the late-notice issue with respect to New Jersey sites in Unisys Corp. v. Insurance Co. of North America, even though neither the insurer nor the insured was a New Jersey corporation or had a principle place of business in New Jersey, and the policies were negotiated and issued in New York and premiums were paid in New York. 712 A.2d 649, 651-53 (N.J. 1998). "New Jersey's interest in protecting New Jersey

Applying New Jersey choice of law rules with respect to insurance contracts as instructed by New Jersey case law, the Court concludes that the relevant and principal insured risk was located in New Jersey. Under New Jersey's site-specific approach and the guidance provided by the Restatement, the Court finds that New Jersey law applies to the late-notice issue because New Jersey possesses the dominant significant relationship. The Court reaches this result because the law of New Jersey, as the principal location of the insured risk with respect to the New Jersey locations, is to determine coverage issues relating to this casualty insurance policy. Restatement § 193; Id. cmt f. In addition, New Jersey courts apply New Jersey law to coverage and exclusion issues arising out of insurance contracts which cover a New Jersey risk no matter where they are made and whether or not they also cover risks in other states.[7] Johnson Matthey, 593 A.2d at 373. Moreover, even if New York was the place of contracting, the law of New York differs from that of New Jersey–the site of the insured risk–with respect to the late-notice issue; in such situations, New Jersey courts apply the law of New Jersey. Pfizer, 712 A.2d at 643 ; NL Industries,154 F.3d at 158-60.

Thus, following the lead of New Jersey's choice of law rules and its courts, the Court will apply New Jersey law to the issue here presented. Accordingly, Defendants motion seeking a determination that New York or Connecticut law applies will be

---

policyholders and, *indirectly, those suffering losses covered under the policies*, would be served by the application of New Jersey law to the New Jersey sites." Id. at 653.

[7] Though the great number of New Jersey cases discussing the site-specific approach involve environmental litigation, as illustrated above, the analysis is applicable in other contexts: "Although this rule is peculiarly suitable to environmental litigation, in which large numbers of casualty insurance policies are involved, it is not limited to that setting." Johnson Matthey, 593 A.2d at 373.

denied.

## C. Application of New Jersey Law

Applying New Jersey law to the late-notice issue requires Gulf to demonstrate prejudice before the late-notice defense may defeat Plaintiffs' claim. Gulf's argument that Plaintiffs' complaint must be dismissed, based on New York law, is therefore premature and Plaintiffs' Complaint will not be dismissed at this time.

## Conclusion

The Court having considered the written submissions of the parties, and for the reasons discussed above,

IT IS on this 28th day of March 2012 hereby ORDERED that the law of New Jersey controls the late-notice dispute.

                                      /s/Joseph H. Rodriguez
                                      Hon. Joseph H. Rodriguez
                                      United States District Judge